UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JANE DOE, *by her next friend*
*Carole Pahssen*,

        Plaintiff,

                                    Case Number 08-11539-BC

v.                                      Honorable Thomas L. Ludington

MERRILL COMMUNITY SCHOOL
DISTRICT, *et al.*,

        Defendants.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR TO DISMISS, DISMISSING PLAINTIFF'S TITLE IX CLAIMS AGAINST INDIVIDUALLY-NAMED DEFENDANTS WITH PREJUDICE, DISMISSING PLAINTIFF'S § 1983 CLAIMS AGAINST THE INDIVIDUALLY-NAMED DEFENDANTS WITH PREJUDICE ON THE BASIS OF QUALIFIED IMMUNITY, DISMISSING PLAINTIFF'S § 1983 CLAIMS AGAINST DEFENDANT MERRILL WITH PREJUDICE, GRANTING PLAINTIFF'S MOTION TO AMEND/CORRECT COMPLAINT AND TO ADD PARTY DEFENDANTS, AND GRANTING PLAINTIFF LEAVE TO JOIN PROPOSED DEFENDANTS**

On April 10, 2008, Plaintiff Jane Doe, who is a minor, filed a complaint against Defendant Merrill Community School District ("Merrill") and severally individually-named Defendants, through her next friend, Carole Pahssen. Plaintiff's complaint identifies two causes of action against Merrill and the individually-named Defendants. The first count alleges violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, by Merrill and the individually-named Defendants in their official capacities. The second count alleges violations of Plaintiff's rights to "equal protection and liberty as preserved by the due process clauses of the Fifth and Fourteenth Amendments," under 42 U.S.C. § 1983, by Merrill and the individually-named Defendants in their individual capacities.

Now before the Court is Defendants' motion for summary judgment or to dismiss [Dkt. # 9], filed on September 26, 2008. On January 9, 2009, Plaintiff filed a response [Dkt. # 29], and on January 14, 2009, Defendants filed a reply [Dkt. # 32]. On February 6, 2009, the Court held a hearing on Defendants' motion. On February 5 and 6, and March 2, 2009, Plaintiff filed a total of four supplemental briefs [Dkt. # 46, 47, 48, 50]. Consistent with the discussion below, the Court will grant in part and deny in part Defendants' motion.

I

Plaintiff's complaint alleges the following facts:

In the fall of 2007, Plaintiff was an eighth-grade student at Merrill Middle School, part of Defendant Merrill Community School District ("Merrill"). Merrill Middle School is located in the same building as Merrill High School. Defendant John Searles ("Searles") is the current superintendent of the school district and Defendant Chris Garno ("Garno") is the current principal of Merrill High School. The remainder of the individually-named Defendants are members of the Merrill Board of Education.[1]

On December 20, 2007, shortly after the end of the school day and on school premises, Plaintiff was raped by John Doe, a ninth-grade student at Merrill High School. Plaintiff had stayed after school that day and was waiting for a ride home from her father when the rape occurred. The rape was verified by a rape kit and John Doe confessed.

Prior to that date, on September 24, 2007, another incident involving Plaintiff and John Doe took place at an eighth-grade girls basketball game. Plaintiff was a member of the team and her

---

[1] The individually-named board members are Dan Armentrout, president; Brent Brown, secretary; Jill Dubay, trustee; John Johnston; vice president; Sarah Kipfmiller, trustee; Christine Porras, trustee; and Elizabeth Wietfeld, trustee.

-2-

father was the assistant coach. During the fourth-quarter of the game, Plaintiff's father observed John Doe in the bleachers, making gestures as if he were masturbating, in Plaintiff's direction. Plaintiff did not welcome these gestures. After the game, Plaintiff's father observed John Doe jogging towards the team, yelling Plaintiff's name. Plaintiff's father initiated a conversation with John Doe; witnesses, including superintendent Searles, observed John Doe attempt to escalate the conversation into an altercation with Plaintiff's father.

Upon returning home, Plaintiff's father spoke with Plaintiff about John Doe's sexual gestures. Plaintiff acknowledged that they occurred and that they embarrassed her. That evening, Plaintiff's father provided a letter to the "administration," setting forth what occurred at the basketball game and expressing his belief that it was imminent that John Doe would harm Plaintiff. At some point, Plaintiff told her father that John Doe had told her, "If you want to hang out with me, you will have to suck my dick." Plaintiff alleges that her mother told Defendants that John Doe had physically assaulted Plaintiff by throwing her against her locker on a different occasion.

After the incident at the basketball game, Plaintiff alleges that Defendants allowed John Doe to stay at school and to attend after-school activities "under supervision." However, Plaintiff alleges that Defendants did not implement any means by which they would have notice that John Doe was on school premises. Plaintiff's complaint also alleges that Defendants were aware that John Doe had a criminal record and that he had been charged with second- and third-degree criminal sexual conduct, involving his eleven-year old female relative.

Plaintiff's response to Defendants' motion and Plaintiff's supplemental briefs allege the following additional facts:

At the beginning of his sixth grade year, which was apparently the 2004 to 2005 school year,

-3-

John Doe attended Breckenridge schools.  He only attended Breckenridge for three weeks before he transferred to Merrill Middle School.  Pl.'s Resp. Ex. J.  During the 2004 to 2005 school year, Michael Thayer was principal of Merrill Middle School and Gary Smith was principal of Merrill High School.  Smith Tr. 4:18-23, Feb. 4, 2009.  Thayer testified that John Doe's behavior was "consistent," during the 2004 to 2005 school year in that "there were few school days where he did not receive some type of disciplinary measures."  Thayer Tr. 13:21-24, Feb. 25, 2009.  Although Thayer testified that he had not been aware of any sexually inappropriate behavior by John Doe, he described a December 2004 incident in which John Doe was told to "keep his hands off girls" by another school employee.  *Id.*  9:4-14:12.

Similarly, Smith testified that he and Thayer discussed "a lot of problems" regarding John Doe.  *Id.*  5:13-18.  When asked if he ever learned of any issues that John Doe had with female peers at Merrill, Smith testified:

A: I don't, I don't remember him being – I can vaguely remember one incident where, I think [Michael Thayer] was still there.  Where there was an issue where him and a girl got into a pushing match or something of the sort, but just vaguely.  But he again you know certainly capable of that put it that way.

Q: Capable of what, assault?

[Objection]

Q: Capable of what, assault?

[Objection]

A: Definitely.

Q: Capable of sexual assault?

A: Definitely.

[Objection]

Q: And you formed that mental impression while you were in charge of the middle and the high school?

A: I formed that impression when he was there and Mike Thayer was still the middle school

-4-

principal.

*Id.* 6:5-7:8.  Smith testified that it did not take a "genius" to figure out that "this kid can hurt somebody." *Id.* 7:10-13.

In about February or March 2005, John Doe returned to Breckenridge.  Pl.'s Resp. Ex. J. A May 4, 2006, letter written by Breckenridge Middle School principal Sheila Pilmore states that on April 22, 2005, John Doe put a female student, L.S., "into a headlock and bang[ed] her head into the locker." *Id.*  The principal viewed the incident on a security camera. *Id.*  In addition to that incident, which resulted in a mild concussion, L.S. testified that John Doe touched her inappropriately "quite often," and that his actions included grabbing her chest and butt. L.S. Tr. 5:2-13, Jan. 23, 2009.  L.S. testified that she told several teachers about John Doe's behavior, that they "talked to him," but that "didn't work." *Id.* 5:17-6:12.  A May 5, 2006, letter written by principal Pilmore to the Breckenridge Police Department identifies the dates of six "documented infractions specifically dealing with sexual harassment," of other students by John Doe, ranging from March 22, 2005, through April 28, 2006.  Pl.'s Resp. Ex. J.[2]

John Doe's disciplinary record from Breckenridge reflects that Breckenridge suspended John Doe several times in 2006.  Pl.'s Resp. Ex. E.[3]  On March 22, 2006, John Doe was suspended for two and a half days based on "sexual harassment." *Id.*  On April 5, 2006, he was "suspended to office." *Id.*  On April 10, 2006, he was disciplined and "sent home." *Id.*  On April 28, 2006, he was suspended for "gross insubordination" for ten days, "pending school board action." *Id.*  It is unclear to what extent these incidents overlap with the six incidents identified by principal Pilmore in her

---

[2]  The dates listed are 3/22/05, 5/19/05, 9/26/05, 10/5/05, 3/22/06, and 4/28/06.

[3]  Plaintiff obtained the document in response to a subpoena issued to Breckenridge Schools; Plaintiff contends that it should have been in John Doe's "permanent," or "CA-60," file.

May 4, 2006, letter to the Breckenridge Police Department.

On May 2, 2006, while John Doe was on his last suspension at Breckenridge, the superintendent of Breckenridge schools, Jeff Jennette, wrote a letter to John Doe's parents, which was included in John Doe's "permanent," or "CA-60," file.  The letter states as follows:

> This is a letter to inform you that Breckenridge Schools will not require your son, [John Doe], to attend Breckenridge Schools in the future.  You are free to entertain other education opportunities for [John Doe], and I wish you and him the best of luck in finding a program that is right for him.  The administration has been notified of this, and upon receiving the "records request" from his new district, his records will be sent to his new district with only the information that the new district requires.

Pl.'s Resp. Ex. I.  A note handwritten on the letter is dated August 17, 2006, and states:

> John -
>
> You might want to contact B'ridge to check out what he did.
>
> Thanks,
>
> Gary

*Id.*  Smith testified that he wrote the note to superintendent Searles and that he "probably" delivered it to Searles' secretary.  Smith Tr. 12:23-13:11, 18:25-19:5.  Smith testified that he wrote the note because "we had all the problems with [John Doe] as a seventh grader," and explained that "we don't need to take this student because he's a school of choice and all the problems he has."  *Id.* 14:18-15:4.  Smith further testified that it "sends a huge red flag" when another school district says, "we don't want this kid that lives in our district you can have him, go anywhere you want."  *Id.* 15:5-9.

Smith testified that it did not concern him that Jennette's letter stated that Breckenridge would only send the new district the information that it required.  *Id.* 15:16-19.  He clarified, "you know all they can send is the CA-60.  That's all that's required, whatever's in the CA-60.  Anything beyond that, you know if they have some additional discipline papers whatever they don't have to

send those and typically they don't." *Id.* 15:19-23. When counsel asked Smith if it would make him "more suspicious" of the language if he knew that "an abbreviated form of records was sent to Merrill," Smith stated, "Certainly does." *Id.* 26:3-25.

Superintendent Searles testified that his impression of the letter from Breckenridge to John Doe's parents was "that the district is sending this letter and saying that we don't require your son to attend anymore. My understanding is that a school district can't really do that. It seems odd." Searles Tr. 8:11-14, Jan. 7, 2009. Searles acknowledged in his testimony that Breckenridge may have "selectively" sent Merrill information regarding John Doe based upon counsel's representation that Breckenridge had provided additional information to the Gratiot County Prosecutor's Office that it had not provided to Merrill. *Id.* 12:6-14. Searles also acknowledged that Breckenridge had a duty to expel John Doe if it believed that he had committed criminal sexual conduct on school grounds, and that such an expulsion would have prevented John Doe from enrolling in any public school in Michigan. *Id.* 12:15-13:22.

When counsel asked John Doe's mother if anyone at Breckenridge ever told her "that they'd make you a deal if you, you know that they'd let him leave as opposed to being expelled," John Doe's mother replied, "Yes." John Doe's Mother Tr. 8:7-10, Jan. 7, 2009. She testified that she did not remember the "full conversation," but that it was with superintendent Jennette. *Id.* 8:11-17. When asked if she felt threatened by the conversation, she replied, "No. Because the incident that happened with my son did not happen on school property, had nothing to do with school the one you're referring to." *Id.* 9:1-4. When counsel inquired about the incident that occurred off school premises, John Doe's mother indicated that the situation involved allegations of sexual assault at a church across the street from her home. *Id.* 9:10-13. However, she then indicated that the situation

at the church was not the one about which superintendent Jennette was speaking to her.  *Id.* 9:14-15. She indicated that she could not recall any reason for the conversation with Jennette about expelling John Doe or asking John Doe to voluntarily leave.  *Id.* 9:16-19.

Ultimately, on or about August 17, 2006, John Doe transferred from Breckenridge Schools to Merrill Middle School.[4]  The transfer notice reflects that Breckenridge sent John Doe's CA-60 file to Defendant Merrill on August 23, 2006.  Pl.'s Resp. Ex. D.  During the 2006 to 2007 school year, Smith was principal of both the Merrill middle and high schools.  Thayer Tr. 18:5-10. However, Thayer was apparently still the middle school principal and Smith the high school principal at the time that John Doe applied to return to Merrill.  The point at which the transition occurred is not identified.

Thayer testified that "typically," once a school of choice student applied to Merrill, "as a principal, you'll try to make contact with the school just to get a heads-up on what is going on with the student.  And then we will share this information with the superintendent before accepting the student as a schools of choice student."  *Id.* 15:9-18.  Thayer testified that when John Doe applied to return to Merrill, "if I was the middle school principal when he reapplied, I would have been the one to make the call."  *Id.* 16:8-13.  He recalled several phone calls to and from Breckenridge, including conversations with principal Pilmore.  *Id.* 16:15-18.  Thayer testified that Pilmore told him that John Doe's "behavior had not improved," and that "they were getting to the point of not allowing him to go back to Breckenridge schools because of the number of run-ins and the danger he presented."  *Id.* 16:24-17:3.  Thayer testified that he was not aware of John Doe engaging in any

---

[4] While testimony from Thayer and Smith indicates that Searles made the decision to re-enroll John Doe at Merrill, the parties have not advanced evidence to suggest the date that Searles or the board of education granted John Doe's application.

sexually inappropriate behavior while attending Breckenridge.  *Id.* 15:19-23.

Thayer testified that Smith showed him the letter from Breckenridge superintendent Jennette to John Doe's parents.  *Id.* 18:18-21.  Thayer testified that he and Smith agreed that John Doe should not come back to Merrill.  *Id.* 18:22-25.  He also testified that he "was present during a conversation with John Searles and Gary Smith where it was indicated to John Searles that Merrill schools should not take John Doe back as a student."  *Id.* 19:5-9.  He testified that Smith told Searles that John Doe was a threat and a danger to other students.  *Id.* 19:15-25.  Smith testified that he "thought it was incredibly bad judgment to bring this kid back."  Smith Tr. 29:5-11.

Smith testified that he was "sure" that he talked to both Searles and Thayer about his handwritten note on the letter from Jennette to John Doe's parents.  *Id.* 19:24-20:6.  Searles testified that he did not see the note until he was copying the CA-60 for the purposes of this case.  Searles Tr. 4:24-5:24.  Smith testified that he "would be shocked" if Searles made that claim.  Smith Tr. 19:19-20:8.  Smith further testified that he did not know if Searles ever contacted Jennette.  *Id.* 19:6-8.  An affidavit provided by Plaintiff's counsel states that "Garno[5] and Searles admitted that they never contacted Breckenridge Schools to determine what the student had done while attending school there, or what records were removed from his permanent record."  Pl.'s Resp. Ex. F.[6]

---

[5]  Smith was principal of the high school at that time, and Smith was taking over from Thayer as middle school principal.  What Garno's affiliation was with Merrill at the time that John Doe applied to Merrill is not explained.

[6]  Plaintiff contends that several pieces of information should have been included in John Doe's CA-60 file, pursuant to Mich. Comp. Laws § 380.1311.  The relevant statutory provisions are the following:

Subsection (2) of § 380.1311 requires permanent expulsion, subject to possible reinstatement, of a student who commits "criminal sexual conduct in a school building or on school grounds."  When an individual is expelled pursuant to subsection (2), "the expelling school district shall enter on the individual's permanent record that he or she has been expelled pursuant to subsection (2)."  § 380.1311 (3).  Additionally, a student expelled under subsection (2) is "expelled from all public schools" in Michigan and "the officials of a school district shall not allow the individual to enroll in the school district unless the individual has been

In September 2006, the Gratiot County Prosecutor's Office sent a notice to the superintendent of Breckenridge Schools and to Merrill, indicating that John Doe was being charged with one count of assault and battery.  Pl.'s Resp. Ex. A.  A police report suggests that the charge arose out of the alleged rape of one victim and the alleged sexual assault of two other victims.  Pl.'s Resp. Ex. B.  The notice was not included in John Doe's CA-60 file produced by Defendants; Plaintiff obtained it through a subpoena to the prosecutor's office.

Smith testified that John Doe's mother advised him, at some point after John Doe had re-enrolled at Merrill, that John Doe could not return to Breckenridge because he had inappropriately touched or tried to rape a female student.  Smith Tr. 16:1-17:2.  He testified that he did not know if he ever learned that the conduct occurred on school grounds.  *Id.*  18:2-13.  He testified that he could not recall whether he relayed this information to Searles.  *Id.*  18:14-17.  He stated, "I think we had several conversations about John Doe and I'm guessing everything I knew about John Doe I probably told John [Searles]." *Id.*[7]

In a letter dated October 24, 2006, Smith wrote to John Doe's parents the following:

---

reinstated under subsection (5)." *Id.*

    In this situation, Breckenridge did not expel John Doe pursuant to subsection (2), thus, they did not enter that information in John Doe's file.  There is a question as to whether Breckenridge was required to expel John Doe pursuant to subsection (2) because it is unclear whether any criminal sexual conduct actually occurred on school grounds at Breckenridge.  Plaintiff asserts that such conduct occurred and that Breckenridge made a deal with John Doe's parents to not expel him if he left voluntarily.  The parties have not adequately explained precisely what documents are required to be maintained in a student's CA-60 file absent expulsion.

    [7]  Based on this testimony, Plaintiff's counsel wrote in her third supplemental brief [Dkt. # 47] that Smith "testified that it was his ordinary practice to relay everything he knew about John Doe to Superintendent Searles."  Pl.'s 3rd Supp. Br. at 4.  Considering Smith testified that he "thought" he had several conversations with Searles about John Doe and he "guessed" that he "probably," shared information about John Doe with Searles, the Court cautions Plaintiff's counsel that her characterization of this as an "ordinary practice," at a minimum, is inaccurate.

> As per our meeting of 23 October 2006, your student [John Doe] is suspended for the reminder [sic] of this semester of school year 2006-07.  However, before [John Doe] can return to Merrill Community Schools as a student, there must be writing documents that establish there has started and that progress has been made with [John Doe] addressing his oppositional behaviors with adults and peers, his lack of respecting the rights of other students and staff members, anger management, and self-control issues.

Pl.'s Resp. Ex. X.  Smith carbon copied Searles on the letter.  *Id.*  When counsel asked what John

Doe did to result in his suspension in October 2006, Smith testified:

> Okay.  John Doe was again everything I've written in here.  He was again disrespectful to all the staff, teachers, cooks in the kitchen, myself, secretaries, he had a terrible temper in that he was very volatile.  He wouldn't, again in terms of didn't get along with other kids, he couldn't control himself, tons of anger.
>
> And I can't recall the exact incident or incidents, it was probably several, leading up to this.  Where finally it was like you know this kid is nothing but problems, he's a harm, he's a danger to himself and to others, okay.
>
> Where he became again and that's probably all these things lumped together.  I can't remember one specific thing, but it was something where again you know because of everything he continued to do just finally said we're going to long-term suspend you until you get some help with these issues.

Smith Tr. 8:16-9:7.  Smith testified that when John Doe was suspended in October 2006, it was his

"plan" for John Doe's parent to obtain counseling for John Doe, and that he had intended to verify

John Doe's enrollment in counseling before allowing him to return in January 2007.  *Id.* 11:21-

12:10.  When John Doe returned to Merrill, Smith testified that he was under the belief that John

Doe's parents had not obtained counseling for him.  *Id.* 12:11-12:22.

Smith testified that there was "possibly" discussion about expelling John Doe in 2006, and

that they "probably should [have] somewhere cut him loose and expel him, but we didn't." *Id.* 20:9-

12.  He also testified that he did not recall whether he considered initiating expulsion proceedings

in fall 2006.  *Id.* 29:5-11.  He also did not recall whether there was any discussion about expelling

John Doe in spring 2007.  *Id.* 20:13-18.

-11-

On February 28, 2007, a social worker, Carol MacDonald, prepared a report, or "initial social work interview," regarding John Doe. MacDonald Tr. 5:2-25, Jan. 27, 2009. The report refers to rape allegations against John Doe based on conduct that occurred during the time that he was attending Breckenridge schools. *Id.* 7:11-18. MacDonald testified that it was her "understanding" that the report "was going to an outside person," to do "an outside evaluation," because John Doe's mother "didn't trust anybody at the school." *Id.* 7:3-5, 8:22-24. She further testified that she did not recall whether she discussed the allegations of criminal sexual conduct against John Doe with anyone at Merrill. *Id.* 8:15-24. MacDonald confirmed that the report would have been made available to Merrill once John Doe was deemed eligible for special education services. *Id.* 10:8-11.

Beginning in about July 2007, Defendant Garno became principal of Merrill High School, and Smith retired. Smith Tr. 4:18-23. It is not clear who became the middle school principal when Smith retired, although it may have been Garno.

On August 27, 2007, an individualized education program ("IEP") team meeting regarding John Doe took place. Pl.'s Resp. Ex. U. Julie Frick, a Gratiot County probation officer, was noted as present at the meeting. *Id.* The IEP report notes that John Doe was in "outside counseling." Pl.'s Resp. Ex. V. A document that Plaintiff's counsel obtained from the prosecutor's file indicates that the counseling was court-ordered, at least in part because John Doe posed a "sexual threat" and showed an "emerging pattern of inappropriate sexual behavior." Pl.'s Resp. Ex. W.

In September 2007, the Gratiot County Prosecutor's Office sent a second notice to Merrill, indicating that John Doe was being charged with one count of second-degree criminal sexual conduct involving a person under age thirteen. Pl.'s Resp. Ex. C. This charge apparently arose out of John Doe's alleged sexual assault of his ten year-old cousin. *See* Pl.'s Resp. Ex. O. This notice

-12-

was not included in John Doe's CA-60 file produced by Defendants; Plaintiff obtained it through a subpoena to the prosecutor's office.

At some point during the time that John Doe attended Merrill, John Doe threw Plaintiff against a locker, as alleged in Plaintiff's complaint. Pl. Tr. 15:10-15. Plaintiff testified that her science teacher, Ms. Megan McMahan, had witnessed the incident. *Id.* 15:10-17. Plaintiff testified that Ms. McMahan advised her that John Doe had previously been in trouble for violent behavior. *Id.* 17:17-18:16. Plaintiff testified that she did not report the incident to any other school employees. *Id.* 19:19-20:4. She testified that she told her parents about the incident "a couple of weeks" after the basketball game incident occurred. *Id.* 19:2-18.

Plaintiff's mother testified that she reported the locker incident to Smith and Plaintiff's social studies teacher, Mr. Christopher Wiley, the day after Plaintiff told her about it. Pl.'s Mother Tr. 124:23-125:3. She testified that she spoke to Searles about the locker incident at a basketball game "the same week that I talked to Mr. Smith." *Id.* 56:1-15, 57:1-23. She testified that the locker incident was the first incident involving Plaintiff and John Doe. *Id.* 121:20-25.

It is not clear when the locker incident occurred. At the time she spoke to Smith, Plaintiff's mother identified him as the middle school principal or "acting" principal. *Id.* 123:13-124:13. She indicated that Garno later became the middle school principal. *Id.* However, as noted earlier, Smith testified that he retired in July 2007. Smith Tr. 4:18-23. Thus, it is unclear if he was "acting" as middle school principal beyond that date.

Principal Garno testified that at some point Ms. McMahan had reported to her that Plaintiff had told her father that John Doe had told her that he wanted her to "suck his dick." Garno Tr. 46:1-47:25, Jan. 7, 2009; *see also* Pl.'s Resp. Ex. Y (Garno's notes of a discussion with McMahan).

-13-

McMahan testified that she did not remember whether Plaintiff or her mother had told her about John Doe's comment to Plaintiff. McMahan Tr. 17:20-18:4, Jan. 7, 2009. Garno testified that in response to complaints of sexual harassment she "investigate[s]" by "tak[ing] the statements down from the student that is making the complaint" and then "call[ing] in the student that they have made the complaint against and ask[ing] them about it." Garno Tr. 13:8-16. Plaintiff contends that Garno did not investigate John Doe's alleged comment to Plaintiff. While the deposition testimony provided to the Court does not directly reflect that Principal Garno did not investigate the allegations regarding John Doe's comment, Principal Garno's testimony emphasized that her knowledge of the comment was not from Plaintiff, but from Plaintiff's father, through McMahan. *Id.* 47:6-8.

Garno testified that she had notice of the criminal sexual conduct charges against John Doe prior to the incident at the basketball game on September 24, 2007. *Id.* 53:3-6, 54:4-7. Garno testified that she did not inquire into the nature of the charges against John Doe, and that she was not aware that she could inquire into charges against a juvenile. *Id.* 54:8-16.

Plaintiff's mother testified that Ms. McMahan told her that she would deliver a copy of the letter written by Plaintiff's father regarding the incident at the basketball game on September 24, 2007, to "every Board member, to the superintendent, to the principal." Pl.'s Mother Tr. 73:2-74:23, Jan. 7, 2009. On September 27, 2007, a meeting took place regarding a positive behavior support plan for John Doe. Pl.'s Resp. Ex. II. Individuals present included John Doe and his mother, Garno, special education teacher Helen Dietrich, social worker Carol MacDonald, Ms. McMahan, and three other individuals whose signatures are illegible or their affiliations with Merrill are not known. *Id.* One is Marlene Stavely, another appears to have the last name Jackson, and the last signature is completely illegible. *Id.*

-14-

Garno testified that she did not share information about the criminal charges pending against John Doe with the team members of the positive behavior support plan because it "is not information I generally hand out at a meeting amongst other people."  Garno Tr. 76:18-21.  She testified that at some point John Doe's mother had informed her that the charges related to the inappropriate touching of John Doe's cousin.  *Id.* 78:3-9.

McMahan testified that had she known about the criminal charges pending against John Doe, she "would probably have [had] more of a concern" that John Doe would hurt Plaintiff.  McMahan Tr. 44:12-18.  She had observed the confrontation between Plaintiff's father and John Doe immediately following the basketball game and had requested an escort to her vehicle because she was afraid of John Doe.  Upon questioning by counsel, McMahan testified that prior to the rape of Plaintiff, she "probably had a concern" that John Doe would hurt a staff member or a student.  *Id.* 16:15-17.  Upon further questioning concerning whether she thought John Doe posed a "sexual threat," McMahan testified, "I think it concerned me yes."  *Id.* 17:6-8.

Another team member, Stavely, testified that she "sat in on the meeting," but that she "did not help put together" the plan.  Stavely Tr. 21:9-11, Jan. 27, 2009.  She testified that she would not have wanted to know about the criminal charges pending against John Doe because the issue that was being addressed, sexual gestures, "are not uncommon" in her classroom.  *Id.* 19:10-20:19.  Stavely also testified that she did not know that the gestures had occurred at a basketball game and were specifically directed at Plaintiff.  *Id.* 20:20-21.  She testified that she did not know if it would have been important for her to know that, stating, "I don't know.  It may have it may not have, I don't know.  I feel like you're going to badger me with these questions until I answer yes."  *Id.* 21:12-20.  She repeated that she did not think it would have been important for her to know where

the gestures occurred and that she did not know if it would have made a difference that they were directed at a particular student. *Id.* 22:3-10. She did, however, testify that it "possibly" would have been important to know that John Doe had previously pushed Plaintiff into a locker. *Id.* 22:18-25. Finally, she testified that the purpose of the plan was to improve John Doe's behavior rather than to protect Plaintiff. *Id.* 23:6-11.

Similarly, Helen Dietrich testified that the purpose of the plan was to improve John Doe's behavior. Dietrich Tr. 5:2-3, 26:14-27:10, Jan. 27, 2009. As a team member, she also was not informed of the identify of the student at whom John Doe had directed sexual gestures, although she thought she had been told that the gestures took place at a basketball game. *Id.* 24:20-21, 25:3-10. She stated that she did not know if it would have been significant for her to know that the gestures were directed at Plaintiff. *Id.* 25:20-26:8.

Plaintiff's mother testified that after the incident at the basketball game, she was told that John Doe was going to be placed on supervision, meaning that he was going to be escorted to his classes and supervised at all times. Pl.'s Mother Tr. 128:7-9. Plaintiff's mother further testified that high school principal Garno subsequently told her that, "I'd have to see him to be able to say if he's supervised or not. I'd have to see him being alone in the halls. I'd have to see him being there. I can't supervise somebody I don't see." *Id.* 103:21-25. In an affidavit, Plaintiff's counsel represents that Defendant Garno stated that, "You cannot punish a student because you think he might do something." Pl.'s Resp. Ex. F.

Plaintiff's mother testified that after Plaintiff was raped, she asked Garno if the school had been aware that John Doe was "in trouble for molesting his seven-year old niece." Pl.'s Mother Tr. 135:20-23. She testified that Garno replied that "she had heard something about it, but hadn't heard

-16-

the whole story." *Id.* 136:5-6.  She further testified that Garno stated that John Doe was "innocent until proven guilty." *Id.* 136:10-13.

Plaintiff alleges that on January 30, 2008, the Gratiot County Prosecutor's Office initiated charges against John Doe based on the rape of Plaintiff.  In response to the rape, Defendants expelled John Doe for 180 days. *See* Pl.'s Resp. Ex. P.  A letter sent to John Doe's parents on February 1, 2008, indicates that Defendants permanently expelled John Doe pursuant to Mich. Comp. Laws § 380.1311(2).  Pl.'s Resp. Ex. EE.  In February 2008, Midland Public Schools requested John Doe's CA-60 file, which Plaintiff alleges that Defendant Merrill forwarded, devoid of any references to the rape.  Plaintiff states that the failure to incorporate records relating to expulsion for sexual assault violates Mich. Comp. Laws § 380.1311.  Defendants' position on this issue is not stated.

Principal Garno  testified that she kept a "separate" file for John Doe, in addition to his CA-60 file.  Garno Tr. 35:13-14.  She testified that she kept such files on "several students if there's occurrences that happen and I need to have something in my hands." *Id.* 35:16.  With respect to the separate file on John Doe, she testified that she kept the separate file "[b]ecause it was in my office and convenient for me and easy for me to access information." *Id.* 35:19-22.  She testified that documents in the "separate" files "make their way into the students' permanent files, but not immediately." *Id.* 35:23-36:1.  Principal Garno testified that she maintained the notices of criminal proceedings against John Doe in the separate file, and that it was "an oversight" when they were not sent to Midland with his CA-60 file. *Id.* 36:5-37:17.  Her testimony reflects that the September 2006 notice regarding a charge of "assault and battery" was included in the CA-60 file. *Id.* 61:5-7, 73:20-74:1.

II

Defendants' motion for summary judgment and to dismiss raises the affirmative defense of qualified immunity under Rule 12(b)(6) and challenges the merits of Plaintiff's claims under Rule 56(c). To survive a Rule 12(b)(6) motion, a plaintiff's complaint "must contain either direct or inferential allegations respecting all the material elements [of the claim] to sustain a recovery under some viable legal theory." *First Am. Title Co. v. Devaugh*, 480 F.3d 438, 444 (6th Cir. 2007) (internal quotation omitted). "When a court is presented with a Rule 12(b)(6) motion, it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss, so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). If matters outside the pleadings are presented and not excluded by the court in a 12(b)(6) motion, the motion must be treated as one for summary judgment under Federal Rule of Civil Procedure 56. Fed. R. Civ. P. 12(d).

Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). A fact is "material" if its resolution affects the outcome of the case. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*,

215 F.3d 594, 599 (6th Cir. 2000).  An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).  When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

The party bringing the summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).  The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The party who bears the burden of proof must present a jury question as to each element of the claim, *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000), rather than raise only "metaphysical doubt as to the material facts." *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

-19-

Under Rule 56(f), if a party opposing a motion for summary judgment "shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition," a district court has discretion to deny the motion, order a continuance, or issue any other just order. A court should not grant summary judgment "absent *any* opportunity for discovery." *White's Landing Fisheries, Inc. v. Buchholzer*, 29 F.3d 229, 231 (6th Cir. 1994). However, a court is not required to allow time for further discovery "if the party does not explain how such discovery would rebut the movant's showing of the absence of a genuine issue of material fact." *Singleton v. United States*, 277 F.3d 864 (6th Cir. 2002). Relevant factors include when the party "learned of the issue that is the subject of the desired discovery," the potential impact of the desired discovery on the summary judgment ruling, "how long the discovery period lasted," whether the party was "dilatory in its discovery efforts," and whether the party was "responsive to discovery requests." *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196-1197 (6th Cir. 1995) (internal citations omitted).

III

Defendants contend that Plaintiff's Title IX cause of actions fails as a matter of law for three reasons. First, the individually-named Defendants contend that only an institution may be held liable under Title IX, citing *Soper v. Haben*, 195 F.3d 845 (6th Cir. 1999). Plaintiff concedes in her response that Title IX does not provide for suits against individual defendants. Pl.'s Resp. Br. at 24. Thus, the Court will dismiss Plaintiff's Title IX claims to the extent that the claims are alleged against the individually-named Defendants. The remainder of the Title IX analysis will be applied to Plaintiff's Title IX allegations against Merrill only. Merrill's second argument is that Plaintiff's Title IX cause of action is deficient because any sexual harassment of Plaintiff was not sufficiently "severe, pervasive, and objectively offensive" to constitute actionable harassment under Title IX.

-20-

Third, Merrill contends that it was not "deliberately indifferent" to any known harassment of Plaintiff because it took appropriate disciplinary action against John Doe.

A

Title IX provides, with certain exceptions not at issue here, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a). The U.S. Supreme Court has determined that "recipients of federal funding may be liable for 'subjecting' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 646-47 (1999). Notably, general agency principles do not apply to liability under Title IX; "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct." *Id.* at 640. Thus, liability arises from "an official decision by the recipient [of federal funds] not to remedy the violation." *Id.* at 642 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 542 U.S. 274, 290 (1998)).

Said another way, recipients of federal funds are liable in damages "only where their own deliberate indifference effectively 'cause[d] the discrimination.' " *Id.* at 643 (alteration in original) (quoting *Gebser*, 542 U.S. at 291). "[T]he deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Id.* at 645 (internal quotations omitted). Ultimately, the liability of a recipient in damages is limited "to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.*

-21-

The Sixth Circuit has clarified that, under *Davis*, the three elements necessary for liability to attach under Title IX are as follows:

> (1) the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school,
>
> (2) the funding recipient had actual knowledge of the sexual harassment, and
>
> (3) the funding recipient was deliberately indifferent to the harassment.

*Soper*, 195 F.3d at 854.

First, in order to be actionable under Title IX, student-on-student sexual harassment must be "so severe, pervasive, and objectively offensive, and [] so undermine[] and detract[] from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651 (internal citations omitted). "Whether gender-oriented conduct rises to the level of actionable 'harassment' thus 'depends on a constellation of surrounding circumstances, expectations, and relationships,' including, but not limited to the ages of the harasser and the victim and the number of individuals involved." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998), and citing Dep't of Educ., Office of Civil Rights, Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12034, 12041-42 (1997) ("OCR Title IX Guidelines")). Other considerations may include the conduct's severity, the frequency of the abusive conduct, whether the conduct is physically threatening or humiliating rather than merely offensive, and whether the conduct interferes with the plaintiff's performance. *Johnson v. Galen Health Insts., Inc.*, 267 F. Supp. 2d 679, 685 (W.D. Ky. 2003) (addressing teacher-student harassment). "[I]n the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it," however,

"[d]amages are not available for simple acts of teasing and name-calling among school children." *Davis*, 526 U.S. at 651-52.

Second, actual knowledge is required, and whether the defendant had the requisite knowledge may be a question of fact. *See, e.g.*, *Martin v. Swartz Creek Cmty. Schs.*, 419 F. Supp. 2d 967, 972-74 (E.D. Mich. 2006) (noting that the Supreme Court has rejected a "knew or should have known" standard in the context of teacher-student harassment and citing *Davis*, 526 U.S. at 642); *Soper*, 195 F.3d at 855 (finding that the knowledge element could not be met when the "defendants did not have actual knowledge of the harassment until after the fact"). A plaintiff must demonstrate that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the federal funding recipient's behalf" had actual knowledge of the facts underlying the plaintiff's Title IX claim. *Gebser*, 524 U.S. at 290. The knowledge element may be satisfied when "an appropriate official has actual knowledge of a substantial risk of abuse to students based on prior complaints by other students." *Johnson*, 267 F. Supp. 2d at 687-88 (rejecting a requirement that a defendant must have actual knowledge of the specific conduct directed at the plaintiff).

Third, school administrators are "deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648 (noting that "courts should refrain from second-guessing the disciplinary decisions made by school administrators") (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 342-43 n.9 (1985)). Under the OCR Title IX Guidelines, a school district "should take immediate and appropriate steps to investigate and otherwise determine what occurred and take steps reasonably calculated to end any harassment, eliminate a

-23-

hostile environment if one has been created, and prevent harassment from occurring again." 62 Fed. Reg. at 12042. *See, e.g.*, *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000) (finding that "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances"); *Soper*, 195 F.3d at 855 (finding that the deliberate indifference element could not be satisfied when the defendants "quickly and effectively corrected the situation" upon learning of it); *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 448 (6th Cir. 2009) (finding sufficient evidence of deliberate indifference when a "school district knows that its methods of response to harassment, though effective against an individual harasser, are ineffective against persistent harassment against a single student"); *Martin*, 419 F. Supp. 2d at 974-75 (finding sufficient evidence of deliberate indifference when the plaintiff "continued to make complaints of harassment every single month, [] the school district's efforts to discuss these events or otherwise punish individual student harassers did not abate the frequency or severity of such incidents," and the plaintiff had alleged that defendant-officials had witnessed events with no response).

## B

Plaintiff has alleged that the following incidents involving John Doe and Plaintiff occurred, and that Defendant Merrill had knowledge of them: First, at some point, no later than October 2007, John Doe physically assaulted Plaintiff by throwing her against her locker at school. Second, at some point, no later than October 2007, John Doe made a comment to Plaintiff regarding a sexual favor. Third, on September 24, 2007, John Doe made sexual gestures towards Plaintiff at a basketball game and attempted to start a physical altercation with Plaintiff's father on school premises. Fourth, and finally, on December 20, 2007, John Doe raped Plaintiff on school premises.

-24-

Plaintiff has also alleged that Defendant Merrill had knowledge of the following incidents involving John Doe and other individuals: First, from March 2005 through April 2006, John Doe was involved in six incidents of sexual harassment and a sexual assault on school premises while attending Breckenridge Middle School.  Second, on April 22, 2005, John Doe put a female student into a headlock and banged her head into a locker while attending Breckenridge.  Third, in September 2006, John Doe was criminally charged with one count of assault and battery arising out of the alleged rape of one victim and the alleged sexual assault of two other victims, incidents that occurred before John Doe re-enrolled at Merrill.  Fourth, in September 2007, John Doe was criminally charged with one count of criminal sexual conducting involving a person under the age of thirteen arising out of the alleged sexual assault of his younger cousin.

With respect to the first element of her Title IX claim, Plaintiff contends that the Court should consider all of the above-listed incidents involving John Doe to address whether his conduct amounts to "severe, pervasive, and objectively offensive" conduct.  Plaintiff relies on *Peer v. Porterfield*, for the proposition that "previous acts of sexual harassment need not be directed at the plaintiff in order to satisfy the first element of a Title IX claim."  No. 1:05-cv-769, 2006 WL 3898263, at *7 (W.D. Mich. Jan. 8, 2007).  This conclusion is somewhat at odds with the proposition that actionable harassment is conduct that "so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651.  Neither Plaintiff nor *Porterfield* adequately explain how harassment of other individuals by John Doe would impact Plaintiff's educational experience at Merrill, particularly when those incidents are alleged to have occurred when John Doe attended Breckenridge.

-25-

Nevertheless, the Court need not decide that issue at this juncture because the incidents involving Plaintiff and John Doe at Merrill may be sufficient to establish "severe, pervasive, and objectively offensive" sexual harassment by John Doe. There are four alleged incidents of sexual harassment involving John Doe and Plaintiff, including John Doe throwing Plaintiff against her locker, John Doe making comments to Plaintiff regarding a sexual act, John Doe making sexual gestures towards Plaintiff at a basketball game, and John Doe raping Plaintiff on school premises. This combination of alleged conduct, which includes a rape, an incredibly severe form of "sexual harassment," rises to the level of actionable student-on-student sexual harassment under Title IX.

Notably, whether the rape should be considered in determining whether the sexual harassment that took place was "severe, pervasive, and objectively offensive" was not an issue illuminated by either party. Plaintiff's papers assume that the rape should be considered, while Defendant's assume that it should not be considered. Neither party provided legal authority addressing the issue. Yet it does not appear that Plaintiff claims that Defendants' response to the rape was deliberately indifferent when it expelled John Doe. Thus, to the extent that the rape is characterized as the harm that Plaintiff suffered due to Defendants' deliberate indifference to "severe, pervasive, and objectively offensive" sexual harassment, the rape would not be relevant to the analysis of the severe, pervasive, and offensive nature of the sexual harassment because it was not sexual harassment to which Defendants were "deliberately indifferent." On the other hand, such analysis may conflate the "severe, pervasive, and objectively offensive" and "deliberate indifference" elements of a Title IX claim in an inappropriate manner.

With respect to the second and third elements of Plaintiff's Title IX claim, actual knowledge and deliberate indifference, incidents involving John Doe and other individuals are relevant to the

analysis. *See Winzer v. Sch. Dist. for the City of Pontiac*, 105 F.App'x 679, 2004 WL 1543160, at *2 (6th Cir. July 7, 2004) (unpublished) (noting that *Davis* did not decide whether "known acts of student-on-student harassment must have been directed against the plaintiff," and finding it unnecessary to answer that question in the case before it). In determining whether Merrill was "deliberately indifferent" to sexual harassment of Plaintiff by John Doe, incidents involving John Doe and other students are relevant to the extent that Merrill had "actual knowledge" of them, thereby informing Merrill of John Doe's propensity to commit sexual harassment. In other words, the question is whether Merrill acted deliberately indifferent given the totality of its actual knowledge of John Doe sexually harassing Plaintiff and any other individuals. At the same time, however, only Merrill's responses to incidents that occurred on Merrill school premises are relevant. *See Davis*, 526 U.S. at 646 (emphasizing that liability for student-on-student sexual harassment is based at least in part on the fact that "the harasser is under the school's disciplinary authority"). Generally, Merrill does not have authority to impose discipline on John Doe for incidents not occurring on school premises.

With respect to the second element of Plaintiff's Title IX claim, actual knowledge, Merrill concedes, at least for the purposes of the motion before the Court, that it had actual knowledge of the incidents involving Plaintiff and John Doe prior to Plaintiff's rape. In contrast, the degree of knowledge that Merrill had regarding John Doe's conduct towards other individuals is uncertain. This is largely because Defendant filed its motion for summary judgment before significant portions of discovery had been completed by the parties. Thus, the facts of the case have been continually unfolding before the Court, with new discovery material provided to the Court as late as March 2, 2009.

-27-

Nonetheless, Plaintiff has advanced evidence raising genuine issues of material fact concerning the degree of knowledge that Merrill had concerning John Doe's discipline problems and sexually inappropriate conduct directed at other individuals.  First, Plaintiff advances Smith's testimony to show that he generally knew that John Doe had gotten into a "pushing match or something of the sort" with a girl during the 2004 to 2005 school year, and that Thayer reported "a lot of problems" with John Doe while he was at Merrill Middle School.

Second, prior to the time that John Doe re-enrolled at Merrill, Plaintiff advances evidence that Merrill, through various individuals, knew the following: Searles knew that Breckenridge did not want John Doe to remain at their school for the 2006 to 2007 school year.  Thayer knew from principal Pilmore that John Doe's "behavior had not improved" while he was at Breckenridge during the 2005 to 2006 school year.

Third, after John Doe re-enrolled at Merrill, Plaintiff advances evidence that Merrill, through various individuals, knew in September 2006 that John Doe was being prosecuted for one count of assault and battery.[8]  At some point, Smith learned from John Doe's mother that John Doe could not return to Breckenridge because he had inappropriately touched or tried to rape a female student; Smith may have relayed that information to Searles.  Merrill knew that John Doe generally had anger management and self control issues.  After February 28, 2007, Merrill may have known through social worker MacDonald's report, to which Merrill had access, that John Doe was accused of rape while at Breckenridge.  Merrill may also have learned, through probation officer Frick's presence at an August 27, 2007, IEP meeting, that John Doe was in "outside counseling" because

---

[8]  Plaintiff has not advanced any evidence that Merrill contacted the Gratiot County Prosecutor's Office to find out that the conduct underlying the charge involved the alleged rape of one victim and the alleged sexual assault of another.  At the hearing, Merrill represented that the prosecutor testified that school districts do not usually contact them to find out details regarding notices of charges pending against a student.

he posed a "sexual threat." Merrill knew in September 2007 that John Doe was being prosecuted for one count of second-degree criminal sexual conduct involving a person under age thirteen. At some point prior to Plaintiff's rape, Garno "heard something about" John Doe molesting John Doe's young niece.

In order to determine whether Plaintiff has raised a genuine issue of material fact with respect to the third element of Plaintiff's Title IX claim, deliberate indifference, the Court must, in applying the standard of review, view the evidence regarding Merrill's knowledge and responses, along with all the other evidence, in the light most favorable to Plaintiff. First, Merrill contends that its response to the rape in December 2007 was not deliberately indifferent because Defendant permanently expelled John Doe, recognizing that Michigan law compelled that result. *See* Mich. Comp. Laws § 380.1311(2). The Court agrees; Merrill's response to the rape was not "clearly unreasonable" under Title IX.

Second, Defendant contends that its response to John Doe's conduct, including sexual gestures, at the basketball game on September 24, 2007, was not deliberately indifferent because Defendant imposed a thirty-day period of supervision on John Doe. Plaintiff contends that Defendant knew that this response was inadequate because principal Garno's testimony indicated that the "supervision" did not provide her notice as to when John Doe was on school premises. Nonetheless, Plaintiff does not appear to allege that John Doe engaged in any other inappropriate conduct directed at Plaintiff during this period. Indeed, Merrill argued at the hearing that John Doe was "flourishing" under the plan and represented that his special education teacher's testimony indicated that the plan was working because John Doe did not like it.

-29-

Had the incident at the basketball game been an isolated incident, it is highly doubtful that Plaintiff could prove Merrill's response was deliberately indifferent. However, taking the evidence of what Merrill knew in the light most favorable to Plaintiff, the incident was not isolated. Merrill conceded for the purposes of this motion that it knew about at least two more incidents - one in which John Doe threw Plaintiff into a locker, and one in which John Doe made a comment to Plaintiff regarding a sexual act. Regardless of whether those incidents happened before or after the basketball game incident and whether Merrill knew about them before or after it implemented the supervision plan, Merrill has not advanced any evidence to suggest that it responded to those incidents in any particular manner.

Moreover, Plaintiff has at least raised genuine issues of material fact as to the extent of Merrill's knowledge of John Doe's discipline problems at Breckenridge and the criminal charges involving sexual misconduct pending against John Doe. While not all of John Doe's disciplinary problems involved sexually inappropriate conduct, many problems did, and the others provide a context for viewing the sexually inappropriate conduct. In light of the extent of Merrill's potential knowledge of the risk that John Doe posed to Plaintiff, and its lack of a response to the locker incident and John Doe's sexual comments, Merrill's response to the basketball game incident and those two incidents may have been deliberately indifferent. Plaintiff has raised a genuine issue of material fact.

As a general matter, relating to all three elements of Plaintiff's Title IX claim, the Court notes that there are fact issues presented by the parties as to the nature of John Doe's conduct, both at Breckenridge and at Merrill. While, "a school system has an unmistakable duty to create and maintain a safe environment for its students as a matter of common law," *Doe v. Claiborne County*,

-30-

103 F.3d 495, 510 (6th Cir. 1996), a school's *in loco parentis* status was not codified by Title IX. Rather Title IX only addresses conduct by the school that amounts to discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Thus, for Title IX claims based on student-on-student sexual harassment, only misconduct motivated by gender, as opposed to any misconduct against a student of the opposite sex, is potentially relevant. *See, e.g.,Porterfield*, 2006 WL 3898263, at * 7 (noting that the plaintiff's allegations that the alleged harraser-student was involved in "previous incidents of misconduct (none of which were of a sexual nature) cannot possibly qualify as 'severe, pervasive, and objectively offensive sexual harassment' ").

Based on the above, the Court will deny Defendants' motion for summary judgment to the extent that it alleges a Title IX claim against Merrill.

IV

With respect to Plaintiff's claims under § 1983, Defendants' motion raises a qualified immunity defense as to the individually-named Defendants, and contends that all Defendants are entitled to summary judgment on the merits of Plaintiff's § 1983 claims. Before the Court can address Defendants' arguments as they relate to Plaintiff's claims under § 1983, it is first necessary to determine what Plaintiff's claims are, and to which claims Defendant has raised the defense of qualified immunity.

First, it is apparent that Plaintiff has alleged due process and equal protection claims – Count II of Plaintiff's complaint alleges that Merrill and the individually-named Defendants in their individual capacities violated Plaintiff's "Constitutional Right to equal protection and liberty as due process and equal protection rights under § 1983. Compl. ¶ 66. What is not apparent is whether Plaintiff has raised a retaliation claim under the First Amendment. In responding to Defendants'

motion for summary judgment or to dismiss, Plaintiff states: "It is firmly established that Plaintiff has a constitutional right to be free from sexual harassment by a government official and under the First Amendment to be free from retaliation for reporting it." Yet, Plaintiff's complaint does not cite the First Amendment, nor provided any factual allegations that appear to support a claim for retaliation under the First Amendment. The only reference to retaliation is in a portion of the complaint entitled "common allegations," which is incorporated into Plaintiff's counts. There, Plaintiff alleges "[t]hat since the rape, Defendants have retaliated against [Plaintiff] and have tolerated abuse by the minor's fellow students relating specifically to the rape." Compl. ¶ 49. Based on the above, the Court concludes that Plaintiff has not raised a First Amendment claim in her complaint.

Second, Defendants have clearly raised the defense of qualified immunity with respect to Plaintiff's due process claim. However, there is potential ambiguity as to whether Defendants have raised the defense as to Plaintiff's equal protection claim. Defendants do not address the facts of Plaintiff's equal protection claim in a particularized manner in their motion. Indeed, the words, "equal protection" do not appear anywhere in Defendants' motion or in their reply. Nonetheless, Defendants broadly contend that they are entitled to qualified immunity "with respect to Plaintiffs' [sic] federal claims contained in counts I & II of their [sic] complaint." Dft's Br. at 4. Arguably, this includes Plaintiff's equal protection claim, particularly when Plaintiff's complaint does not contain many allegations specific to an equal protection claim that Defendant would be able to specifically address in its motion. *See* Compl. ¶¶ 73-76. Thus, the Court concludes that Defendant has raised the defense of qualified immunity with respect to both Plaintiff's due process and equal protection claims under § 1983.

-32-

A

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' " *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  The privilege serves the purpose of, early in litigation, preventing suits from progressing because qualified immunity is "an *immunity from suit* rather than a mere defense to liability."  *Id.* at 200 (emphasis in original).

Qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The Sixth Circuit undertakes a three step analysis to determine whether an official is entitled to immunity:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Id.* at 901.  *See Pearson v. Callahan*, - - - U.S. - - - -, 129 S. Ct. 808, 818 (2009) (finding that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

With regard to the second step, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that

-33-

an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted). Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2001) (citation omitted).

The individually-named board members, and superintendent Searles and principal Garno, have raised three main arguments regarding qualified immunity. First, the individually-named board members contend that they are entitled to qualified immunity because they were "not involved" in the events alleged in Plaintiff's complaint. Second, Defendants Searle and Garno contend that they are entitled to qualified immunity because Plaintiff has not advanced any evidence that they had "prior knowledge of a substantial risk of harm" to Plaintiff. Third, Defendants collectively contend that they are entitled to qualified immunity on Plaintiff's § 1983 claims because there is no "clearly established right" to "any particular level of competence by Board of Education members, administration, and teachers in supervising students that are prohibited from school grounds after hours."

1

First, the individually-named board members contend that they are entitled to qualified immunity on Plaintiff's § 1983 claims because "[t]here is no allegation in the Plaintiff's Complaint, or any evidence whatsoever, that would indicate that the individual Board Members witnessed or had any involvement in the investigation into the September 24, 2007 incident." This argument construes Plaintiff's allegations more narrowly than is justified. For example, Plaintiff contends that her due process rights were violated by the individual board members both because they allowed

-34-

John Doe to return to Merrill and because they did not take proper disciplinary action against John Doe when problems developed after his return to Merrill. The members of the board of education were indisputably involved in the decision to allow John Doe to return to Merrill. Additionally, Plaintiff has advanced evidence, through her mother's testimony, that the individual board members knew about the September 24, 2007, incident at the basketball game. Thus, the individual board members are not entitled to qualified immunity on the ground that they simply were "not involved."

2

Defendants' second and third arguments that they are entitled to qualified immunity will be examined together, as Defendants do not clearly distinguish between the arguments in their briefs. Defendants Searles and Garno contend that they are entitled to qualified immunity on Plaintiff's § 1983 claims because Plaintiff has not advanced any evidence that they had "prior knowledge of a substantial risk of harm" to Plaintiff. Defendants collectively contend that they are entitled to qualified immunity on Plaintiff's § 1983 claims because there is no "clearly established right" to "any particular level of competence by Board of Education members, administration, and teachers in supervising students that are prohibited from school grounds after hours."

To support these arguments, Defendants essentially contend that none of Plaintiff's federal rights were violated when the only incident that they had knowledge of was the incident at the basketball game. At the hearing, they contended that they would still be entitled to qualified immunity even if they conceded that they had knowledge of the locker incident and John Doe's sexual comment directed at Plaintiff. Defendants emphasize that their response to John Doe's behavior, the imposition of a period of supervision, was appropriate given their obligation to provide him with an education in the "least restrictive environment." In response, Plaintiff addresses each

-35-

of her § 1983 claims separately; for the purpose of clarity, the Court will do the same.

a

First, Plaintiff acknowledges that to establish an equal protection violation, she must show that her complaints were treated differently by Defendants than were complaints made by her male counterparts. *Soper*, 195 F.3d at 852. However, Plaintiff does not advance any factual allegations to support an equal protection violation. Plaintiff alleges that John Doe was treated more favorably than Plaintiff in this situation, because "no action" was taken against him, and Defendant determined that his right to an education "outweighed" Plaintiff's right to be safe. However, Plaintiff cites no legal authority to support the proposition that an equal protection violation may be proved by evidence that a peer harasser was somehow treated more favorably than the victim, rather than by proving that other victims were treated more favorably than Plaintiff. Instead, Plaintiff represents that "discovery is continuing as to the ordinary procedure for handling complaints of sexual harassment and as to whether similar complaints of sexual harassment were treated differently by these Defendants." Pl.'s Resp. Br. at 25.

Defendants did not provide a reply to Plaintiff's equal protection argument. Nonetheless, it is significant that qualified immunity is "an *immunity from suit* rather than a mere defense to liability." *Saucier*, 533 U.S. at 200 (emphasis in original). Thus, while a court may allow additional time for discovery when a party makes a sufficient showing that further discovery that is material to the qualified immunity analysis is necessary, a party is not entitled to complete discovery before addressing the issue of qualified immunity. Here, Plaintiff has advanced no factual allegations that when viewed in the light most favorable to Plaintiff, would "show that a constitutional violation has occurred." *Champion*, 380 F.3d at 901. Nor has Plaintiff made a sufficient showing under Rule

-36-

56(f) demonstrating the necessity of additional discovery that would be material to the issue of qualified immunity. Thus, the individually-named Defendants are entitled to qualified immunity on Plaintiff's equal protection claims brought under § 1983.

b

Second, Plaintiff alleges two theories to support her due process claims – a "special relationship" theory, and a "state-created danger" theory. Generally, "[t]he Due Process clause protects the right against 'unjustified intrusions on personal security' at the hands of the state.' " *Soper*, 195 F.3d at 852 (quoting *Ingraham v. Wright*, 430 U.S. 651, 673 (1977)). "The purpose of the Due Process clause is 'to protect people from the State, not to ensure that the State protect[s] them from each other.' " *Id.* (quoting *DeShaney v. Winnebago County DSS*, 489 U.S. 189, 196 (1989)). However, "certain 'special relationships' created or assumed by the State with respect to particular individuals may give rise to such an affirmative duty and are enforceable through the Due Process clause to provide adequate protection." *Id.* (internal quotations omitted). Notably, a state's compulsory school attendance laws do not create a "special relationship" giving rise to a constitutional duty. *Id.* at 853.

Plaintiff argues that a "special relationship" exists in this case because "Defendants assumed the duty to supervise [John Doe] and denied [Plaintiff's] parents of knowledge relating to his criminal and behavioral history so as to prevent them from taking appropriate actions themselves." Additionally, Plaintiff contends that because Defendants assured Plaintiff's parents that they would protect her from John Doe, an affirmative duty to do so arose. The Court is not persuaded that Defendants had a constitutional "duty to supervise John Doe" based on Defendants' alleged statements to Plaintiff's parents. Notably, in *Soper*, the Sixth Circuit found that no "special

-37-

relationship" existed even though the plaintiff alleged that a teacher had told the plaintiff's mother that they would "keep an eye on the children." 195 F.3d at 849. Thus, Plaintiff cannot maintain a due process claim under a "special relationship" theory.

Alternately, under the "state-created-danger" theory, liability may be found where "affirmative acts by the state [] either create or increase the risk that an individual will be exposed to private acts of violence." *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 464 (6th Cir. 2006) (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998)). Under this theory, there are three requirements to impose liability: (1) "an affirmative act that creates or increases the risk," (2) a special danger to the victim as distinguished from the public at large," and (3) "the requisite degree of state culpability." *Id.* (citing *Kallstrom*, 136 F.3d at 1066-67).

The first requirement, of an affirmative act plus risk creation, is not met if "the victim would have been in about the same or even greater danger even if the state officials had done nothing." *Id.* at 466. Plaintiff alleges that the following are affirmative actions by Defendants: (1) Defendants re-enrolled John Doe at Merrill in August 2007, (2) Defendants tolerated John Doe's sexual harassment of Plaintiff, and (3) Defendants implemented an inadequate plan to "supervise" John Doe. Of these allegations, only Defendants' enrollment of John Doe at Merrill can fairly be characterized as an "affirmative act." Given John Doe's discipline problems, which included alleged criminal sexual misconduct, Defendants' enrollment of John Doe arguable increased the risk that Plaintiff would be harmed at school.

With respect to the second requirement, there is a "special danger to the victim," when the relevant group of potential victims includes "everyone in the school" as opposed to the general public. *McQueen*, 433 F.3d at 468 (noting that the court would "have little difficulty assuming that

if the relevant group included everyone in the school, the special danger requirement still would be satisfied").

With respect to the third requirement, a requisite degree of state culpability, the Sixth Circuit has stated that "in settings that provide the opportunity for reflection and unhurried judgments," a deliberate indifference standard is appropriate. *Id.* at 469. "The government's conduct must be 'so egregious that it can be said to be arbitrary in the constitutional sense.' " *Id.* (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002)). Under this standard, Defendants' affirmative act of enrolling John Doe may have been deliberately indifferent. While Defendants emphasize that they had an obligation to continue the education of John Doe, they were not required by law to enroll him at Merrill. The decision to enroll John Doe was just that, a discretionary decision. And while it is not insignificant that John Doe was assigned to classes in a building "without constant exposure to the general student body," that fact does not negate the possibility that Defendants were deliberately indifferent based on the alleged extent of their knowledge of John Doe's behavioral problems at the time that the decision was made to enroll him.

Yet, even assuming that Defendants' conduct may have been deliberately indifferent, Plaintiff has not cited pre-existing law that would make the unlawfulness of Defendants' enrollment of John Doe at Merrill apparent to a reasonable official. *See Anderson*, 483 U.S. at 640. Plaintiff contends that Defendants are not entitled to qualified immunity because it is firmly established that "Plaintiff has a constitutional right to be free from sexual harassment by a government official and under the First Amendment to be free from retaliation for reporting it." Significantly, "sexual harassment by a government official" is not at issue in this case, and Plaintiff did not allege a First Amendment retaliation claim in her complaint. While a right to bodily integrity is generally

-39-

established, such general allegations do not suffice to prove that a right is clearly established with respect to the school setting or the circumstances of this case.

B

While the Court has determined that the individually-named Defendants are entitled to qualified immunity as to Plaintiff's § 1983 claims, the Court has not yet addressed whether Merrill, as a municipality, is entitled to summary judgment on those claims. First, with respect to Plaintiff's allegations of an equal protection violation, the Court indicated in the context of the qualified immunity analysis that Plaintiff has not advanced factual allegations sufficient to support an equal protection claim.

Although Plaintiff represented on January 9, 2009, when she filed her response to Defendants' motion, that discovery was ongoing as to the "ordinary procedure for handling complaints of sexual harassment and as to whether similar complaints of sexual harassment were treated differently by these Defendants," Plaintiff did not specify in a particularized manner the information that she believed would be obtained through additional discovery. Pl.'s Resp. Br. at 25. Additionally, since the close of discovery on January 30, 2009, and the hearing on February 6, 2009, Plaintiff has not submitted any additional material related to her equal protection claim, despite submitting four supplemental briefs, including one as recently as March 2, 2009. Thus, Merrill is entitled to summary judgment on Plaintiff's equal protection claim under § 1983.

Second, with respect to Plaintiff's due process claim, Plaintiff has not advanced evidence of a custom, practice or policy related to the re-enrollment of John Doe at Merrill or any other affirmative act by which Plaintiff alleges that Merrill violated her due process rights under a state-created danger theory. *See Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978).

-40-

Thus, Merrill is entitled to summary judgment on Plaintiff's due process claim under § 1983.

V

Also before the Court is Plaintiff's motion to amend/correct complaint and to add party defendants [Dkt. # 34]. Plaintiff seeks to join the following as parties: (1) Breckenridge Community Schools; (2) Jeff Jennette, former superintendent of Breckenridge Community Schools; (3) Sheila Pilmore, principal of Breckenridge Middle School; and (4) Sally MacLennan. Plaintiff alleges that during discovery, Plaintiff learned that the proposed Defendants "entered into an agreement to purge [John Doe's] permanent student file in violation [of Mich. Comp. Laws] § 380.1311 so as to hide all evidence of criminal sexual misconduct that occurred on school grounds while he was a student at Breckenridge Schools." Plaintiff also alleges that Breckenridge, Jennette and Pilmore "acted deliberately indifferent manner toward acts of pervasive sexual harassment that were ongoing at Breckenridge schools." The current Defendants did not file a response in opposition to Plaintiff's motion.

Based on the above, the Court will grant Plaintiff leave to join Breckenridge, Jennette, Pilmore and MacLennan as party defendants. However, the Court notes that it grants leave pursuant to Rule 20(a)(2), rather than Rule 15, which is asserted by Plaintiff. Rule 20(a)(2) allows joinder of persons as defendants if two requirements are met:

> (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> (B) any question of law or fact common to all defendants will arise in the action.

The Court finds that Plaintiff's claims against the proposed defendants "aris[e] out of the same transaction, occurrence, or series of transactions or occurrences," and common facts will arise in an

-41-

action against those defendants.

VI

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment or to dismiss [Dkt. # 9] is **GRANTED IN PART** and **DENIED IN PART**.

It is further **ORDERED** that Plaintiff's Title IX claims against Defendants Searles, Garno, Armentrout, Brown, Dubay, Johnston, Kipfmiller, Porras, and Whitfield are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that Plaintiff's claims brought under § 1983  against Defendants Searles, Garno, Armentrout, Brown, Dubay, Johnston, Kipfmiller, Porras, and Whitfield are **DISMISSED WITH PREJUDICE** on the basis of qualified immunity.

It is further **ORDERED** that Plaintiff's claims brought under § 1983 against Defendant Merrill are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that Plaintiff's motion to amend/correct complaint and to add party defendants [Dkt. # 34] is **GRANTED**.

It is further **ORDERED** that Plaintiff is **GRANTED LEAVE** to **JOIN** Breckenridge Community Schools, Jeff Jennette, Sheila Pilmore, and Sally MacLennan as defendants, pursuant to Fed. R. Civ. P. 20(a)(2).  Plaintiff shall file an amended complaint joining the aforementioned parties as defendants on or before **April 6, 2009**.

s/Thomas L. Ludington                        
THOMAS L. LUDINGTON
United States District Judge

Dated: March 26, 2009

-42-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 26, 2009.

s/Tracy A. Jacobs
TRACY A. JACOBS